# Exhibit A

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

███████████████████████████████

May 12, 2023

## (U) Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns

> (U) Use or disclosure of any portions of this report marked "FISA" is subject to the requirements of the Foreign Intelligence Surveillance Act and may also be subject to the June 25, 2020 order of the Foreign Intelligence Surveillance Court in Docket Numbers 16-1182, 17-52, 17-375, and 17-679. Portions marked "FISA" may be included in what is provided to the Attorney General as part of this report. Such portions may not be used or disclosed for any other purpose, including use or disclosure in any report made available to Congress or the public, unless the Assistant Attorney General for National Security confirms that the use or disclosure is authorized by FISA.

## (U) Classified Appendix

### (U) Introduction

(U) This Classified Appendix[1] forms a part of the *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* and provides further information about the matters covered in three sections of the report: Section IV.C.1 (Investigative referral of possible Clinton campaign plan); Section IV.B.1 (The threat of foreign election influence by Foreign Government-2); and Section IV.D.1.a.ii (The Page FISA application renewals).

### (U) I. Section IV.C.1 – Investigative referral of possible Clinton campaign plan

(U) This section provides further factual background about (i) the possible Clinton campaign plan described in the Office's report; (ii) the Office's efforts to verify or refute the information about the plan; and (iii) the manner in which Department officials received and acted on (or did not act on) the campaign plan information. The Office's prosecution decisions related to the plan are described in Section IV.C.2 of the unclassified report.

(U) *Background: Sensitive Intelligence*

███████████ Beginning in or about 2014, and continuing through at least in or about 2016, individuals affiliated with Russian intelligence services hacked and gained unlawful

Classified by: John H. Durham
Derived from: ████████████████████
Declassify on: ██████████

---

[1] (U) The OSC has carefully coordinated the classification review of the unclassified report and this document with the ██████████████████ Based on that coordination and their reviews, the ██████████████████ concur with the classifications.

███████████████████████████

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

access to emails of numerous U.S. public and private entities—including government agencies, non-profit organizations, and think tanks based in the United States. Among the non-profit organizations hacked by Russian government actors in 2016 was the Open Society Foundations, formerly known as the Soros Foundation.[2]



From ████ through ███████ received from a █████████ source, referred to herein as "T1," and shared with the FBI, intelligence consisting of ████████████████████████████[3] We identify the information provided by T1 as "Sensitive Intelligence."[4] The Sensitive Intelligence included (i) emails ██████████████████████████ hacking of U.S.-based communications, (II) ███████████████████████████ reports analyzing the hacked U.S. materials, and (iii) what appear or purport to be original hacked emails of U.S. persons (or portions of such emails).[5] Two of the apparently hacked emails appear to have originated from the Open Society Foundations. The purported author of these emails was Leonard Benardo, who was the Regional Director for Eurasia at the Open Society Foundations.[6] In that capacity, Benardo oversaw efforts relating to Russia and the former Soviet republics, among other countries.[7]

████████████████████ Beginning in ████ 2016, the FBI ██████ received information from T1 relating to the 2016 U.S. presidential election, including ████ reports written by

---

[2] (U/███████ See, e.g., OSC Report of Interview of Headquarters Analyst-3 on December 10, 2019; OSC Report of Interview of Headquarters Analyst-3 on September 17, 2019; OSC Report of Interview of ████ Employee-4 on February 27, 2020 at 1-6.

[3] (U/███████ See, e.g., OIG, U.S. Department of Justice, *A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election, Appendix One*, at 2 (June 2018) (hereinafter "*OIG Review of 2016 Election Actions, Appendix One*"); OSC Report of Interview of Intelligence Community ("IC") Officer-2 on July 8, 2020; OSC Report of Interview of Headquarters Analyst-3 on December 10, 2019; OSC Report of Interview of ████ Employee-4 on February 27, 2020 at 1-4.

[4] ████ Government agencies have needed to translate some of the Sensitive Intelligence. More than one agency has translated some of the items.

[5] (U) *See, e.g.*, OSC Report of Interview of IC Officer-2 on July 8, 2020; OSC Report of Interview of Headquarters Analyst-3 on December 10, 2019; OSC Report of Interview of IC Officer-3 on July 8, 2020.

[6] ██████████████ Classified Appendix Document-1; OSC Report of Interview of IC Officer-2 on July 8, 2020 at 6; OSC Report of Interview of Headquarters Analyst-3 on December 10, 2019 at 1, 4. For a general discussion of the versions of these reports, *see also* OSC Report of Interview of IC Officer-3 on July 8, 2020. As to Benardo's position, *see* OSC Report of Interview of Leonard Benardo on May 21, 2021 at 1.

[7] ███████████████ OSC Report of Interview of Leonard Benardo on May 21, 2021 at 1.

- 2 -

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

[8] These reports referenced purported communications of Benardo and others. In particular, in ████████████████ 2016, T1 provided the U.S. government with two ████ memoranda that described "confidential conversations" ████ between then-Democratic National Committee Chair Debbie Wasserman Schultz and two individuals at the Open Society Foundations (referred to in the memoranda as the "Soros Foundation") i.e., (i) Benardo and (ii) Jeffrey Goldstein who, according to public sources, was senior policy advisor for Eurasia at the Open Society Foundations.[9] The January ████ 2016 memorandum, which was in Russian ████████████ stated in relevant part:

On January 12 of this year, during a confidential discussion with Jeffrey Goldstein, a representative of the Soros Foundation on Eurasia, Democratic National Committee Chairwoman Debbie Wasserman-Schultz characterized the situation in her party in light of the growing scandal surrounding Hillary Clinton as follows:

Information released to the media in the last few days about FBI investigating possible corruption relating to Department of State (under the leadership of Clinton) preferential treatment of donors of the Clinton Foundation caused a significant negative reaction inside the party. At the same time, the leadership of the DP [TN: Democratic Party] had known about the information since June of 2015. According to Wasserman-Schultz, FBI, so far, does not have persuasive evidence against Hillary Clinton because of the timely deletion of relevant data from mail servers.

Obama has no intention to darken the final part of his presidency and "legacy" by the scandal surrounding the main contender from the DP. To solve the problem, the President puts pressure on FBI Director James Comey through Attorney General Lynch, however, so far without concrete results.

Comey gravitates towards Republicans, and apparently, intends to prolong the investigation so that the scandal would keep going until the presidential election to jeopardize the chances of the DP to win the presidential race.[10]

---

[8] (U) OSC Report of Interview of Headquarters Analyst-3 on December 10, 2019.

[9] ████████████████ See generally Classified Appendix Document 2; see also Jeff Goldstein, *While a Good Man Sits in Prison*, Open Society Foundations (May 16, 2010); Jeff Goldstein, *The World Bank Risks Dirtying Its Hands in Uzbekistan*, International Labor Rights Foundation (June 16, 2014) (both identifying Goldstein's position).

[10] (U) Classified Appendix Document-2; cf. *OIG Review of 2016 Election Actions, Appendix One* at 6.

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

The March ██ 2016 memorandum, which was in Russian █████████ stated in relevant part:

> During confidential contacts on March 5th with Leonard Bernardo [sic], Soros Fund Eurasian Regional Director, Debbie Wasserman-Schultz, Chairperson of the National Committee of the Democratic Party, characterized developments in the pre-election campaign of Hillary Clinton in the following way.
>
> In relation to the consensus reached among the Democratic Party (DP) leadership regarding the candidacy of Hillary Clinton, Barack Obama sanctioned the use of all administrative levers to remove possibly negative effects from the FBI investigation of cases related to the Clinton Foundation and the email correspondence in the State Department.
>
> Based upon information from Wasserman-Schultz, the FBI does not possess any kind of direct evidence against Clinton, because of their timely deletion from the email servers. The political director of the Hillary Clinton staff, Amanda Renteria, regularly receives information from Attorney General Loretta Lynch on the plans and intentions of the FBI. Active work is being done questioning potential witnesses who are mostly computer specialists in the Clinton private circle. They represent the only tools which may be used in this matter. Therefore, this threat is minimal.
>
> DNC predicts a certain Clinton victory in the current presidential campaign. The impressive results of Donald Trump are dividing the Republican Party (RP) elite, which find itself "in a near-panic condition."
>
> . . . .
>
> A two-prong DP opposition is focused on discrediting Trump through debates and propaganda activities based upon his weak points, such as his uncontrollable temperament, questionable instances in business dealings, absence of diplomatic skills, lack of political experience.
>
> Among other things, the Clinton staff, with support from special services, is preparing scandalous revelations of business relations between Trump and the "Russian Mafia." Currently, they are studying his connections with Aras Agalarov (owner of a group of companies, "Krokus Grupp"), Timur Sapir (a deceased businessman of Russian heritage, suspected to have had ties to the Italian Mafia), Tevfik Arif (owner of *Bay Rock Group*, suspected of being involved in prostitution and "human trafficking," from the former USSR), and Telman Ismailov (AST Grupp).[11]

---

[11] (U) Classified Appendix Document-2; *cf. OIG Review of 2016 Election Actions, Appendix One* at 6-7.

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

████████████ With regard to the discussion in the last paragraph of this memorandum of "scandalous revelations" that the "Clinton staff" was preparing with support from "special services," the words that FBI linguists translated as "special services" are Russian words that one analyst believed at the time referred to the FBI and the CIA or more broadly to the intelligence and law enforcement communities.[12] Another analyst, caveating it that it was speculation, said that perhaps the phrase "special services" in this context could refer to Trump dossier author Christopher Steele,[13] who, according to media reports and Steele's own testimony in UK legal proceedings, formerly worked as an intelligence professional for the British government.[14] In addition, the Office has determined that, at the time of this memorandum, Glenn Simpson's firm, Fusion GPS, was in fact preparing open source opposition research regarding Trump's purported ties to Russian oligarchs ████████

████████████ On March 31, 2016, FBI personnel, including Deputy Director McCabe, Deputy General Counsel Anderson, Assistant Director for the Cyber Division James Trainor, and the Director's Chief of Staff James Rybicki, shared the intelligence information with Associate Deputy Attorney General David Margolis, the highest-ranking career official in the Department, and other senior career officials at the Department.[16] The FBI briefed Margolis on the specifics of the Sensitive Intelligence and informed him that the FBI assessed the information to likely not be credible.[17] The FBI's assessment, according to McCabe and later memorialized by Anderson in an August 12, 2016 memorandum (discussed below), was based on four factors. *First*, the reports reflected multiple levels of hearsay. *Second*, someone involved in the communication, or in passing along the communication to someone at a think tank, may have engaged in exaggeration. *Third*, the ████████████████ who drafted the

---

[12] (U) OSC Report of Interview of Headquarters Analyst-2 on Feb. 25, 2020 at 5.

[13] (U) OSC Report of Interview of Headquarters Analyst-3 on Dec. 10, 2019 at 4.

[14] (U) Deborah Haynes, *Christopher Steele: Confessions of a Former British Spy on Johnson, Putin, Trump, and James Bond* (Sky News Oct. 24, 2021); Trial Testimony of Christopher Steele, *Peter Aven, et al. v. Orbis Bus. Intel. Ltd.*, Claim No. HQ18M01646 (Mar. 17, 2020) at 147-48.

[15] (U) *See* Nellie Ohr, *Report of 4 March 2016 with Notes March 5.*

[16] (U) *OIG Review of 2016 Election Actions, Appendix One* at 8-10.

[17] (U) OSC Report of Interview of Trisha Anderson on May 26, 2021 at 5.

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

reports may have engaged in editorialization or exaggeration. *Fourth*, the reports may be unreliable because of translation errors.[18]

██████████████ After that meeting, the FBI, ████████████ sought any additional related information from T1.[19] T1 had no responsive information.[20] At this time, the FBI considered taking a number of covert investigative steps to determine, among other things, whether the Attorney General had in fact communicated with Amanda Renteria, the "political director of the Hillary Clinton staff" referenced in the ████████████ memorandum.[21] The FBI ultimately decided not to take these steps.[22] Comey told the OIG that the FBI did not pursue these steps because the information in ████████ reports was not credible on its face.[23] In this regard, Trisha Anderson told investigators that the Director had said the assertion that the Attorney General was pressuring him in connection with the Midyear Exam investigation gave him doubts about the credibility of the two documents.[24] He also understood that Margolis's view was that pursuing such steps would "take us down the path [where] we're investigating the Attorney General of the United States" and that Margolis thought that "you ought to have more of a reason to go forward with it than what you have."[25]

████████████ *The* ████████ *FBI receive additional information from T1 regarding a possible Clinton campaign plan*

██████████████ After receiving the initial intelligence in ████ 2016 ████████████ FBI subsequently received additional intelligence from T1. In particular, in late July 2016 ████████ received a ████████████████████ report that summarized ████████████ certain hacked emails allegedly sent by Leonard Benardo of the Open Society Foundations.[26] ████████████

---

[18] ██████████████ Memorandum from Trisha Anderson to Midyear Exam case file, *Re: Conversations Regarding Two* ████████████████ *Reports* (Aug. 12, 2016).

[19] (U) *OIG Review of 2016 Election Actions, Appendix One* at 10.

[20] (U) *Id.*

[21] (U) *Id.* at 10-11.

[22] (U) *Id.* at 11.

[23] (U) *Id.*

[24] ████████████ OSC Report of Interview of Trisha Anderson on May 26, 2021 at 4; *but cf.* OSC Report of Interview of James Baker on June 8, 2021 at 3 (Baker did "not necessarily agree" with the view that "the two reports were likely not credible").

[25] (U) *OIG Review of 2016 Election Actions, Appendix One* at 11. Regrettably, Mr. Margolis passed away on July 14, 2016

[26] (U) OSC Report of Interview of IC Officer-2 on July 8, 2020 at 6-8; OSC Report of Interview of Headquarters Analyst-3 on December 10, 2019 at 1, 4.

▓▓▓▓▓▓ memorandum stated that Clinton approved a plan proposed by one of her foreign policy advisors, Julianne Smith,[27] to "smear Donald Trump by magnifying the scandal tied to the intrusion by the Russian special services in the pre-election process to benefit the Republican candidate." The translated draft memorandum stated, in relevant part:

> According to data from the election campaign headquarters of Hillary Clinton, obtained via the U.S. Soros Foundation, on 26 July 2016, Clinton approved a plan of her policy advisor, Juliana Smith[28] from the Ts. NAB [TN: unknown acronym][29] to smear Donald Trump by magnifying the scandal tied to the intrusion by the Russian special services in the pre-election process to benefit the Republican candidate.

> As envisioned by Smith, raising the theme of "Putin's support for Trump" to the level of the Olympics scandal would divert the constituents' attention from the investigation of Clinton's compromised electronic correspondence. In addition, by subsequently steering public opinion toward the notion that it needs to equate "Putin's efforts" to influence political processes in the U.S. via cyberspace to acts against a crucially important infrastructure (resembling a national power supply network) would force the White House to use more confrontational scenarios vis-à-vis Moscow that, as a whole, suits Clinton's line of conduct. A relatively "sluggish" reaction by the administration to the events surrounding the DNC, that led to the resignation of Chairman Deborah Wasserman-Schultz provoked exasperation within the PC [TN: Possibly, Political Convention] and the entire Deep State, which may also be used by Clinton to reinforce her position among the security-service agents.

> Clinton's supporters in the FBI lack conclusive irrefutable evidence of the Russian Federation's involvement in the scandal, tied to the theft of the DNC's correspondence. In the meantime, during the launched investigation, there has been a multitude of circumstantial evidence that the alias of Guccifer 2.0 (the name of the hacker who accepted responsibility for the incident) was, in fact, used

---

[27] (U▓▓▓▓▓ At the time, Smith worked at the Center for New American Security ("CNAS") and was serving as a Clinton campaign foreign policy advisor. OSC Report of Interview of Julianne Smith on July 21, 2021 at 1. She advised investigators that she never received notification that her account was hacked, but was aware that CNAS was "regularly challenged by 'friends' in China and Russia." *Id.* at 8.

[28] ▓▓▓▓▓▓▓▓▓▓ In context, it appears ▓▓▓▓▓ memorandum incorrectly referred to Julianne Smith as "Juliana Smith."

[29] (U▓▓▓▓ Bracketed "TN:" is a reference to a translator's note.

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

to cover up a special unit of the GRU [TN: General Staff Main Intelligence Directorate] of the Russian Federation Defense Ministry's General Staff.

. . . .

During the first stage of the campaign, due to lack of direct evidence, it was decided to disseminate the necessary information through the FBI-affiliated "attic-based" technical structures that are involved in cyber security, in particular, the Crowdstrike and ThreatConnect Companies, from where the information would then be disseminated through leading US publications. In addition, it is presumed in the FBI that in the future, any clumsy propaganda campaign by the GRU is bound to lead to the emergence of more reliable indications of Moscow's involvement, which would imminently intensify the US confrontational tendencies toward Russia.[30]

memorandum contains a reference to the Atlantic Council, a think tank based in Washington, D.C.[31] Another the Carnegie Endowment for International Peace.[32] According to an FBI analyst interviewed by the Office, the hacked U.S. institution that was the source of the relevant U.S. communications.[33]

The above-referenced memorandum included the English text of a document that one [34] As discussed above, the document contained a purported email from Benardo appears to have been

---

[30] (U) Classified Appendix Document-3.

[31] (U) OSC Report of Interview of IC Officer-2 on July 8, 2020 at 7; OSC Report of Interview of IC Officer-3 on July 8, 2020 at 3.

[32] (U) OSC Report of Interview of Headquarters Analyst-3 on December 10, 2019 at 1.

[33] (U) *Id.*

[34] (U) Classified Appendix Document-4.

- 8 -

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

partially based. Notably, there ▮▮▮▮▮▮▮▮▮▮▮ of the document, which contained the following text:

> From: Leonard Benardo
>
> Sent: July 25, 2016
>
> Hi,
>
> The media analysis on the DNC hacking appears solid. This is an important story because it would be the first time (that we know of) that a state deliberately uses the infiltration and publication of data to interfere in the US election.
>
> At the same, politicization is on the table.  I have been a bit surprised that nobody has mentioned this 18-month-long story yet in their analysis, and makes explicit reference to US elections at the end.
>
> Julie[35] says it will be a long-term affair to demonize Putin and Trump.  Now it is good for a post-convention bounce.  Later the FBI will put more oil into the fire. Outcome is far from clear as Americans are more keen on their own woes and Hillary is hardly good-looking as far as credibility is concerned. Anyway things are ghastly for US-Russian relations.
>
> Lenny[36]

▮▮▮▮▮▮▮▮▮▮ also received from T1 a slightly different version of this email. This version includes the statement that "later the FBI will put more oil into the fire" and contains an added sentence:

> From: Leonard Benardo
>
> Sent: July 25, 2016
>
> Hi,
>
> The media analysis on the DNC hacking appears solid. This is an important story because it would be the first time (that we know of) that a state deliberately uses the infiltration and publication of data to interfere in the US election.

---

[35] ▮▮▮▮▮▮▮ This appears to be a reference to the Clinton foreign policy advisor referenced in the ▮▮▮▮▮▮▮▮▮ memorandum, Julianne Smith.

[36] (U) See Classified Appendix Document-5; Classified Appendix Document-6.

- 9 -

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

███████████████████████████

At the same, politicization is on the table. I have been a bit surprised that nobody has mentioned this 18-month-long story yet in their analysis, and makes explicit reference to US elections at the end.

Julie says it will be a long-term affair to demonize Putin and Trump. Now it is good for a post-convention bounce. Later the FBI will put more oil into the fire. Outcome is far from clear as Americans are more keen on their own woes and Hillary is hardly good-looking as far as credibility is concerned. *Anyway it should last as long as the Olympics accusations. And* things are ghastly for US-Russian relations.

Lenny[37]

███████████████████████████ also obtained from the Sensitive Intelligence collection ███████████████ an email dated the following day. The FBI's translation of this email is as follows:

Great! A whole bunch of material appeared in the press today regarding this subject. It appears that the noose around Guccifer's Russian background is tightening. I suggest doing [TN: writing] something about a task from someone, I don't know, some dark forces, like the FBI for instance, or better yet, Clinton sympathizers in IC, Pentagon, Deep State (or somewhere else?), about American websites deploying a campaign to demonize the actions of Russia's GRU, acting in accordance to orders by VVP [TN: Vladimir Putin], to undermine the forces of good in the elections in the interest of Donald Trump, who is basically an agent of influence. Using inept GRU operatives (there is such information) and their general inclination to adventurism and idiocy, a number of crucial technical indications pointing to Russia were exposed. And so on. Will that be okay?[38]

██████████████████ Another ███████████ email ███████████ dated July 27, 2016, appears to discuss "mak[ing] [something]" to "illuminate" how Clinton was attempting to "vilif[y] Moscow" and discredit Putin and Trump.[39]

---

[37] ████████████████ Classified Appendix Document-4 (italics added to show difference from other version of email) (emphasis added).

[38] (U) Classified Appendix Document-7.

[39] (U) Classified Appendix Document-6.

███████████████████████████

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

██ [40] The email attached the following English text in a document, which appears to be another email from Benardo, bearing a date of July 27th:

> From: Leonard Benardo
>
> Sent: July 27, 2016
>
> Hi,
>
> HRC approved Julia's idea about Trump and Russian hackers hampering U.S. elections. That should distract people from her own missing email, especially if the affair goes to the Olympic level. The point is making the Russian play a U.S. domestic issue. Say something like a critical infrastructure threat for the election to feel menace since both POTUS and VPOTUS have acknowledged the fact IC would speed up searching for evidence that is regrettably still unavailable. However there seems to be signs GRU penetration (cyrlic, 2.0 VPN elite VPN, Felix Edmundovich). They appear hardly skilled, "incompetent bumbling idiots" as smb [somebody] called them. In absence of direct evidence, Crowdstrike and ThreatConnect will supply the media, and GRU will hopefully carry on to give more facts.[41]

████████████ *The authenticity of the Benardo emails*

████████████ The Office interviewed numerous FBI ████ personnel who were involved in Crossfire Hurricane (or related intelligence efforts) to determine whether they could shed light on the potential reliability or unreliability of the information about the possible Clinton campaign plan. Certain ██ analysts and officers whom the Office interviewed, and who were well-versed in the Sensitive Intelligence collection, stated that their best assessment was that the Benardo emails were likely authentic.[42] Multiple analysts noted that the Russians had, in fact, hacked Benardo's emails █████████████████ [43] Some analysts also noted it was possible, however, that the

---

[40] (U) Classified Appendix Document-8.

[41] (U) *Id.*

[42] (U) *See, e.g.,* OSC Report of Interview of IC Officer-2 on July 8, 2020 at 4, 7; OSC Report of Interview of IC Officer-14 on May 19, 2021 at 4; OSC Report of Interview of Headquarters Analyst-2 on Feb.25, 2020 at 12.

[43] (U) *See, e.g.,* OSC Report of Interview of IC Officer-2 on July 8, 2020 at 4; OSC Report of Interview of IC Officer-3 on July 8, 2020 at 4; OSC Report of Interview of IC Officer-14 on May 19, 2021 at 2.

- 11 -



AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

Russians might have fabricated or altered purported U.S. emails.[44] But some of these analysts also noted that the Sensitive Intelligence was ▮

▮ In addition, the Office obtained records from a number of non-profit organizations and think tanks (that, as noted above, were the victims of hacks by Russian intelligence) to determine the accuracy of the Sensitive Intelligence and whether it in fact reflected an actual plan by the Clinton campaign. These included, among others, the Open Society Foundations, the Atlantic Council, the Carnegie Endowment for International Peace ("Carnegie Endowment"), and the Center for a New American Security (collectively, the "Think Tanks").

▮ Notably, the Office was unable to locate in the records from the Think Tanks any exact versions of the Benardo emails obtained through from T1. The Office did, however, identify certain emails, attachments, and documents that contain language and references with the exact same or similar verbiage to the materials referenced above. For instance, on July 25, 2016 – the same date as one of the emails purportedly from Benardo – Tim Maurer, a Carnegie Endowment cyber expert, replied to an email asking for Maurer's opinion on an article titled, *"The Hacks We Can't See: All Signs Point to Russia Being Behind the DNC Hack."*[46] Maurer began by stating that "[the author] is very good, thoughtful[.]" Maurer then wrote the following, which contains certain language that also appears verbatim in the email attributed to Benardo of the same date:

> [H]is analysis is *solid.* Regarding the DNC story, I agree with Rid that *this is an important story because it would be the first time (that we know of) that a state deliberately uses the* exfiltration *and publication of data to interfere in another country's election.*
>
> At the same time, I have been a bit surprised that nobody has mentioned this March *story yet in their analysis (which makes explicit reference to US elections*

---

[44] (U) *See, e.g.,* OSC Report of Interview of ▮ Employee-4 on Feb. 27, 2020 at 12-13; OSC Report of Interview of IC Officer-2 on July 8, 2020 at 8; OSC Report of Interview of IC Officer-6 on Aug. 19, 2020 at 7; OSC Report of Interview of IC Officer-10 on Oct. 7, 2020 at 2-3; OSC Report of Interview of Headquarters Analyst-2 on Feb. 25, 2020 at 5-6.

[45] (U) *See, e.g.,* OSC Report of Interview of IC Officer-3 on July 8, 2020 at 5-6.

[46] (U) Classified Appendix Document-9; Thomas Rid, *All Signs Point to Russia Being Behind the DNC Hack,* Vice (July 25, 2016).

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

*at the end*): http://www.bloomberg.com/features/2016-how-to-hack-an-election/.[47]

████████████ In addition to this email from Maurer, the think-tank records also contained a July 27, 2016 email from Julianne Smith, the Clinton campaign advisor, in which Smith circulated a draft public statement to certain of her think-tank colleagues. In the email – which Smith sent the day after Clinton purportedly authorized the above-referenced plan – Smith urged her colleagues to sign the draft statement that criticized Trump for his comments about the NATO alliance and asserted that Trump's public statements concerning NATO were too friendly towards Russia. In her cover email, Smith wrote, in part:

> We are writing to enlist your support for the attached public statement. Both of us are Hillary Clinton supporters and advisors but hope that this statement could be signed by a bipartisan group[.] Donald Trump's repeated denigration of the NATO Alliance, his refusal to support our Article 5 obligations to our European allies and his kid glove treatment of Russia and Vladimir Putin are among the most reckless statements made by a Presidential candidate in memory.[48]

(U) During the same week, Clinton's campaign manager, Robby Mook, stated in media interviews that the campaign believed that the Russian government had carried out the DNC hack to assist Trump's electoral chances, and that Trump had made troubling statements concerning Russia.[49]

████████████ As noted above, the Office conducted multiple interviews related to the Sensitive Intelligence, including interviews of Leonard Benardo, Tim Maurer, and Julianne Smith.[50] When Benardo was shown redacted versions of the purported emails from the Sensitive Intelligence, Benardo stated that they did not look familiar to him, and that he would

---

[47] ████████████ Classified Appendix Document-9 (italics added to show difference from other version of email). The article found at the hyperlink above describes the activities of a South America-based political consultant who provides services to electoral campaigns that involve hacking of political opponents.

[48] (U) Classified Appendix Document-9.

[49] (U) Jeremy Herb, *Mook Suggests Russians Leaked DNC Emails to Help Trump*, POLITICO (July 24, 2016), https://www.politico.com/story/2016/07/robby-mook-russians-emails-trump-226084; Jessie Heuman, *Clinton Campaign Manager Questions Russian Involvement in Email Leak*, The Hill (July 24, 2016), https://thehill.com/blogs/ballot-box/presidential-races/288998-clinton-campaign-manager-dnc-to-get-to-bottom-of/.

[50] ████████████ Although Benardo does not possess a security clearance, the Office received one-time authorization from ██████ to show Benardo these materials without disclosing to him how they were obtained. Benardo signed a proffer agreement in which he agreed not to share materials shown to him during the interview with third parties.

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

not have used certain terms, such as "oil into the fire."[51]  Benardo also did not know who "Julie" referred to in the July 25, 2016 purported emails.[52]  Benardo stated that, to the best of his recollection, he did not draft the emails.[53]  Benardo stated, however, that the last sentence in the email – noting that "things are ghastly for US-Russian relations" – sounded like something he would have said.[54]

In an interview with the Office, Maurer likewise was shown the purported emails from Benardo.  Maurer stated that he did not write either email.  He acknowledged, however, writing the above-referenced July 25, 2016 email identified in the Carnegie Endowment's production.  He also acknowledged that portions of the language in the July 25, 2016 email obtained through the T1 collection -- and purported to be from Benardo – were identical to language in Maurer's email of the same date to his colleagues.

Finally, the Office interviewed Julianne Smith.[55]  Smith stated that she neither drafted nor recalled receiving either of the purported Benardo emails.[56]  Smith stated that she did not specifically remember proposing a plan to Clinton or other campaign leadership to try to tie Trump to Putin or Russia.[57]  Smith stated, however, that it was possible that she had proposed ideas on these topics to the campaign's leadership, who may have approved those ideas.[58]  Smith recalled conversations with others in the campaign expressing their genuine concerns that the DNC hack was a threat to the electoral system, and that Trump and his advisors appeared to have troubling ties to Russia.[59]  Smith said it was also possible someone proposed an idea of seeking to distract attention from the investigation into Secretary Clinton's use of a private email server, but she did not specifically remember any such idea.[60]  Smith said, however, that she was certain any proposal she made to the Clinton campaign seeking to highlight issues

---

[51] ████████ OSC Report of Interview of Leonard Benardo on May 21, 2021 at 3.

[52] (U) *Id.*

[53] (U) *Id.*

[54] (U) *Id.*

[55] (U ███ OSC Interview of Julianne Smith on July 21, 2021.

[56] (U ███ *Id.* at 7 (Smith maintains an active Top Secret security clearance.)

[57] (U) *Id.*

[58] (U) *Id.*

[59] (U) *Id.*

[60] (U) *Id.*

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

concerning Trump and Russia would not have included an effort to enlist the FBI in furtherance of those efforts.[61]

In addition, the Office interviewed Clinton herself and several former members of the Clinton campaign using the Sensitive Intelligence materials declassified by the DNI regarding the purported "plan" approved by Clinton. In reviewing the July 2016 declassified Sensitive Intelligence material, Clinton stated that it "looked like Russian disinformation to [her]."[62] Campaign Chair John Podesta stated that he had not seen the declassified materials before, characterized the information as "ridiculous," and denied that the campaign was involved in any such "plan."[63] Senior Policy Advisor Jake Sullivan stated that he had not seen the declassified memorandum before and had no reaction to it other than to say, "that's ridiculous."[64] Although admitting that the campaign was broadly focused on Trump and Russia, Sullivan could not recall anyone articulating a strategy or "plan" to distract negative attention away from Clinton by tying Trump to Russia, but could not conclusively rule out the possibility.[65] Communications Director Jennifer Palmieri stated that she had never seen the memorandum before, found its contents to be "ridiculous," and could not recall anything "like this" related to the campaign.[66] Palmieri stated that Podesta, Sullivan, Mook, and herself were aware of a project involving ties between Trump and Russia being conducted by Perkins Coie, but Palmieri did not think that Clinton was aware of it, nor did Palmieri receive any direction or instruction from her about it.[67] Foreign Policy Advisor-2 confirmed that the campaign was focused on Trump and Russia, but that focus was due to national security concerns and not designed to distract the public from Clinton's server issue. [68] Foreign Policy Advisor-2 stated that she did not have a conversation with Clinton about a plan involving Trump and Russia during the Democratic Convention, that she did not remember Clinton approving anything concrete, but that Foreign Policy Advisor-2 would not necessarily have been involved in such strategy conversations.[69]

The Office's review of certain communications involving Smith provided possible additional support, however, to the notion that the Clinton campaign was engaged in an effort or plan in late July 2016 to encourage scrutiny of Trump's purported ties to

---

[61] (U) *Id.*

[62] (U) OSC Report of Interview of Hillary Clinton on May 11, 2022 at 6.

[63] (U) OSC Report of Interview of John Podesta on Jan. 19, 2022 at 5.

[64] (U) OSC Report of Interview of Jake Sullivan on Nov. 11, 2021 at 3-4.

[65] (U) *Id.*

[66] (U) OSC Report of Interview of Jennifer Palmieri on Nov. 10, 2021 at 4.

[67] (U) *Id.* at 1-2

[68] (U) OSC Report of Interview of Foreign Policy Advisor-2 on Mar. 28, 2022 at 4.

[69] (U) *Id.*

- 15 -

Russia, and that the campaign might have wanted or expected the FBI or other agencies to aid that effort ("put more oil into the fire") by commencing a formal investigation of the DNC hack.

For example, on July 5, 2016, Foreign Policy Advisor-2 emailed campaign advisors Smith, Clinton Campaign Advisor-1 and Clinton Campaign Advisor-2 in which she wrote:

> We're looking for ways to build on Franklin Foer's great (and scary) piece on Trump and Russia. One thing I've heard from a few folks is that the Russia desk at State has been tracking (and sounding an internal alarm) about parallels between rhetoric/words/methods that Trump uses and Putin-supported European right-wing candidates. I'm told it goes beyond just populist stuff. I'd love to get my hands on details of what they are seeing - can one of you help run this down? I imagine INR or IC types might also have some insight - obviously need to be a bit careful here but eager to get specifics or details.[70]

Foreign Policy Advisor-2 stated that she did not speak with anyone at the State Department about this issue.[71] The information she mentioned in this email regarding the State Department's Russia Desk came from Outside Advisor-1.[72]

In addition, on July 25, 2016 – the same day as the purported email from Benardo stating that "Julie says it will be a long-term affair to demonize Putin and Trump" and "[l]ater the FBI will put more oil into the fire" – Smith had the following text message exchange with Foreign Policy Advisor-2:

> From: Foreign Policy Advisor-2
>
> Sent Time: 7/25/2016 11:00 AM
>
> Can you see if [Special Assistant to the President and National Security Council member] will tell you if there is a formal fbi or other investigation into the hack?
>
> From: Julianne Smith
>
> Sent Time: 7/25/2016 11:01 AM
>
> She won't say anything more to me. Sorry. Told me she went as far as she could.
>
> From: Foreign Policy Advisor-2
>
> Sent Time: 7/25/2016 11:02 AM

---

[70] (U) *Id.* at 5.

[71] (U) *Id.*

[72] (U) *Id.*

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

Ok. Do you have others who might?

From: Julianne Smith

Sent Time: 7/25/2016 11:03 AM

Has [Clinton Campaign Advisor-1] tried her? Curious if she would react differently to him? I can also try OVP [Office of the Vice President]. They might say more.

From: Foreign Policy Advisor-2

Sent Time: 7/25/2016 11:05 AM

I don't know if he has but can ask. Would also be good to try ovp, and anyone in IC [intelligence community]

From: Julianne Smith

Sent Time: 7/25/2016 11:32 AM

Left messages for OVP but politico just sent me a push notification stating that they are indeed investigating.

From: [telephone number] Foreign Policy Advisor-2

Sent Time: 7/25/2016 11:35 AM

Fbi just put our [sic] statement. Thx[73]

The Office's best assessment is that the July 25th and July 27th emails that purport to be from Benardo were ultimately a composite of several emails that were obtained through Russian intelligence hacking of the U.S.-based Think Tanks, including the Open Society Foundations, the Carnegie Endowment, and others. Indeed, as discussed above, language from Tim Maurer's email of July 25th is identical to language contained in Benardo's purported email of the same date. Furthermore, given Smith's (i) extensive contacts in the think-tank community, (ii) her public role as a foreign policy advisor for the Clinton campaign, and (iii) her communications with think-tank colleagues regarding Trump, it is a logical deduction that                                    Smith was, at a minimum, playing a role in the Clinton campaign's efforts to tie Trump to Russia. Indeed, Smith's July 27th email to her think-tank colleagues regarding Trump, Russia and NATO – the day after candidate Clinton allegedly approved a plan to tie Trump to Russia – certainly lends at least some credence that such a plan existed. Moreover, Smith's text message exchange with Foreign Policy Advisor-2 supports the

---

[73] (U) *Id.* at 14-15.

███████████████████████████████████

notion that the campaign might have wanted or expected the FBI or other agencies to aid that effort ("put more oil into the fire") by commencing a formal investigation of the DNC hack.

(U████    *The response by the FBI and U.S. intelligence agencies to the Sensitive Intelligence*

████████████    In the days and weeks following receipt of the Sensitive Intelligence from T1, multiple high-ranking U.S. officials received reports and briefings conveying or summarizing, among other information, the intelligence concerning the purported plan by the Clinton campaign. For instance, on August 3, 2016, during a meeting at the White House, CIA Director Brennan briefed President Obama, Vice President Biden, DNI Clapper, FBI Director Comey, and other U.S. officials regarding Russian interference efforts as well as the T1 intelligence received concerning the referenced plan by the Clinton campaign.[74] Brennan's handwritten notes stated, in part, "We're getting additional insight into Russian activities [that] cite alleged approval by Hillary Clinton on 26 July of a proposed plan from one of her foreign policy advisors to vilify Donald Trump by stirring up a scandal claiming Russian interference by the Russian security services."[75]

(U) In addition, as described in the unclassified report, on September 7, 2016, the CIA sent the FBI an "investigative referral" memorandum that referred to, among other information, the purported Clinton campaign plan.

████████    Moreover, in ████ 2017, more than a year after ██████ initially received the ██████ reports, the ████████████████████████████████████████████████████████████████████████████████████████ CIA prepared a written assessment of the authenticity and veracity of the above-referenced intelligence. The CIA stated

---

[74] (U) Notes of John O. Brennan, declassified by DNI Ratcliffe Oct. 6, 2020 (hereinafter *"Brennan Notes"*); Classified Appendix Document-10.

[75] (U) *See* Letter from John Ratcliffe, DNI, to Sen. Lindsey Graham (Sept. 29, 2020) (hereinafter *"Ratcliffe Letter"*).

████████████████████████████████████

████████████████████████████████████

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

that it did *not* assess that the above ████████████ memoranda, or ████████████ ████████ hacked U.S. communications, to be the product of Russian fabrications."[77]

████████ Approximately four years later, in September 2020, the DNI declassified certain information related to the Sensitive Intelligence. In a letter to Senator Lindsay Graham, the DNI declassified, among other things, that:

> In late July 2016, U.S. intelligence agencies obtained insight into Russian intelligence analysis alleging that U.S. Presidential candidate Hillary Clinton had approved a campaign plan to stir up a scandal against U.S. Presidential candidate Donald Trump by tying him to Putin and the Russians' hacking of the Democratic National Committee. The IC does not know the accuracy of this allegation or the extent to which the Russian intelligence analysis may reflect exaggeration or fabrication.[78]

The DNI also declassified a portion of former CIA Director Brennan's handwritten notes that describe the August 3, 2016 meeting with President Obama[79] and the *CIA Referral Memorandum* sent to Director Comey and Deputy Assistant Director of Counterintelligence Peter Strzok.[80]

████████ *The FBI provides a defensive briefing to Attorney General Lynch*

████████████████ On July 12, 2016, FBI personnel, including Deputy Director McCabe and Deputy General Counsel Anderson, briefed Deputy Attorney General Yates and others about the T1 information. While the consensus amongst the group was that the information was not credible, the decision was ultimately made by Yates to brief Attorney General Lynch on the T1 information. Then on August 10, 2016, ████████████ after receiving the initial reports from T1, McCabe and Anderson provided a defensive briefing to Attorney General Lynch regarding the T1 information. McCabe and Anderson gave the Attorney General copies of the January and March 2016 reports to review. For unknown reasons, Lynch was not shown the July 25 and July 27 Benardo emails describing the "plan" by the Clinton campaign to link Trump to Russia. When interviewed by the Office, Anderson stated that to the best of her recollection she never saw the Benardo emails, but noted that they would have been helpful for her interview with Attorney General Lynch.[81]

████████████████ According to Anderson, Lynch denied knowing Renteria (the Clinton campaign official) but did not deny or comment on the broader assertions in ████████████

---

[77] (U) Classified Appendix Document-11.

[78] (U) *Ratcliffe Letter.*

[79] (U) *Brennan Notes.*

[80] (U) *CIA Referral dated Sept. 7, 2016.*

[81] (U) OSC Report of Interview of Trisha Anderson on May 26, 2021 at 7.

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

██████ reports concerning efforts to improperly influence the Department's investigations.[82] According to McCabe in his interview with the OIG:

> [S]he read █████ reports] and I will probably never forget she just finished reading them and said, okay . . . . I mean like I expected more of a reaction than that. Like I expected like, this is crazy, I never talked to that person. But she was absolutely stone faced and said nothing about the content of the memos—which I don't know how to interpret that.[83]

McCabe added that he thought the Attorney General's reaction to the substance of the reports was "odd."[84] Anderson similarly told the OIG that she found it a "little bit weird" that the Attorney General did not affirmatively disavow the contents of █████ reports, and that she (Anderson) and McCabe had discussed the "circumspect" nature of her response.[85] In an interview with the Office, Anderson described Attorney General Lynch as being "a little surprised" at what she read, providing what Anderson noted as a "measured response." Anderson also stated that she (Anderson) was struck by the fact that the Attorney General pronounced the name "Renteria" (the Clinton campaign official) in a peculiar fashion. Additionally, Anderson recalled telling McCabe on the walk back to FBI headquarters that the Attorney General's response to the reports was "odd." Anderson based this assessment on the fact that the Attorney General did not seem visibly outraged, nor did she (the Attorney General) denounce or object to the contents of the reports relating to her alleged contacts with the Clinton campaign.[86]

█████ The OIG Appendix to the 2016 Election Actions report includes a different reaction by the Attorney General than Anderson and McCabe's version of their August 10, 2016 meeting with her. In the first instance, the Attorney General told the OIG that the FBI did not show her the █████ reports she was being asked to examine with the OIG interviewers. Lynch believed that McCabe and Anderson showed her something more abbreviated and told her up front that she was being provided a defensive briefing concerning a collection of materials that were not deemed to have investigative value. She had the distinct impression from McCabe that the reports were not credible and may in fact be fake. Furthermore, the FBI informed Lynch that there were no plans to further investigate or pursue the suggestions in the reports that she had been working with Renteria to influence the outcome of the Midyear investigation. The Attorney General told the OIG that she emphatically told McCabe and Anderson she never knew anyone named Amanda Renteria and that the FBI was welcome to interview her and anyone on her staff. She also told the FBI there was no truth to the

---

[82] (U) *Id.*

[83] (U) *OIG Review of 2016 Election Actions, Appendix One* at 13.

[84] (U) *Id.* at 14.

[85] (U) *Id.*

[86] (U) OSC Report of Interview of Trisha Anderson on May 26, 2021 at 7.

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

allegations in the reports and that she had never communicated with anyone on the Clinton campaign team about the Midyear investigation.[87] [88]

The Office has also interviewed FBI General Counsel Baker, to whom Anderson reported at the time of the defensive briefing. Baker told the Office that, based on reports he received of the defensive briefing, he was greatly concerned about Lynch's reaction.[89] Moreover, Baker, unlike his FBI colleagues, did not dismiss the credibility reports.[90] In fact, Baker informed the Office that following the defensive briefing of Lynch, he began to have concerns about Lynch's potential bias due in part to her (i) curious reaction to the Sensitive Intelligence information, (ii) interaction with former President Clinton

---

[87] (U) *See OIG Review of 2016 Election Actions, Appendix One* at 14-16.



[89] ☐ OSC Report of Interview of James Baker on Feb. 7, 2020 at 10-11 (stating that "he and other FBI Executives had great concerns about Attorney General Lynch's reaction to a memorandum contained in the [Sensitive Intelligence] that alleged she was going to use her position to make sure that Hillary Clinton was not prosecuted"); *see also* OSC Report of Interview of James Baker on June 8, 2021 at 4 (noting that the Attorney General's "reaction upon learning of the allegations 'smelled bad'"); OSC Report of Interview of James Baker on June 18, 2020 at 6 (stating "how bothered he personally was" by the Attorney General's "response of 'Thank You' after being briefed about her alleged exchange of information with Renteria").

[90] (U) OSC Report of Interview of James Baker on June 8, 2021 at 3 (Although Baker saw problems with the credibility of the reports, "he also believed that the reports should not have been dismissed out of hand").

- 21 -

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

on the tarmac in Phoenix, and (iii) guidance to Director Comey that the Clinton email investigation should be referred to as a "matter."[91]

███████████████████████████ In any event, on August 12, 2016, following the defensive briefing of Lynch, Anderson drafted a memorandum summarizing communications between the FBI and the Department and outlining the steps the FBI had taken with respect to the referenced January and March reports collected from T1. As discussed above, in that memorandum, Anderson outlined four reasons why the FBI assessed the information in the reports not to be credible. *First*, the reports reflected multiple levels of hearsay. *Second*, there was the possibility of exaggeration by someone involved in the communication, or in passing along the communication to someone at a think tank. *Third*, ████████████████████ who drafted the reports may have engaged in editorialization or exaggeration. *Fourth*, there was the potential for unreliability due to translation errors. The FBI's assessment of the reports conflicts with that of the CIA, which as noted above, assessed the information to not be the product of Russian fabrication.[92]

████████████████ *The Sensitive Intelligence and Director Comey's announcement of the Clinton email server investigation's findings*

████████████ Director Comey subsequently testified before Congress that the Sensitive Intelligence was among the reasons he decided to announce the conclusion of the FBI's investigation of Clinton's private email server in July 2016 without the participation or awareness of the Attorney General or the Department.[93] According to Comey, although he believed the assertions in ████████ memoranda concerning Lynch's behavior were not consistent with his own interactions with the Attorney General, he was concerned that, if the sensitive intelligence leaked, it could undermine the public's perception of the Attorney General's impartiality and the integrity of the FBI's investigation.[94]

█████████████████████████ In short, neither the Office nor █████████ have been able to determine definitively whether the purported Clinton campaign plan ████████████ ███████████████████████████████ was entirely genuine, partially true, a composite pulled from multiple sources, exaggerated in certain respects, or fabricated in its entirety. Nonetheless, the late July 2016 Sensitive Intelligence, which a senior intelligence official with significant and detailed knowledge of the Sensitive Intelligence collection described as "really concerning," immediately made its way to CIA Headquarters.[95] Director Brennan

---

[91] (U) *Id.* at 4; OSC Report of Interview of James Baker on June 18, 2020 at 6.

[92] (U) Classified Appendix Document-11.

[93] (U) *Testimony of James Comey* at 70-71, HPSCI Russia Investigation (May 4, 2017).

[94] (U) *Id.* at 71; *Testimony of James Comey* at 61, SSCI (June 8, 2017); *OIG Review of 2016 Election Actions, Appendix One* at 16, 29.

[95] (U) OSC Report of Interview of IC Officer-6 on Aug. 19, 2020 at 4.

similarly appears to have recognized the significance of the information as evidenced by his briefing the President, Vice President, the Attorney General, the DNI, the Director of the FBI, and other high-ranking government officials within a matter of days. Moreover, in early September 2016, the CIA prepared a referral memorandum on the information regarding the purported "plan" that went to the FBI, and the information was included in an Intelligence Note prepared later in September 2016 related to Russian election interference.[96] Thus, the record reflects that the FBI was fully alerted to the possibility that at least some of the information it was receiving about the Trump campaign might have its origin either with the Clinton campaign or its supporters, or alternatively, was the product of Russian disinformation. Despite this awareness, the FBI appears to have dismissed the T1 information as not credible without any investigative steps actually having been taken to either corroborate or disprove the allegations.

## (U) II. Section IV.B.1 – The threat of foreign election influence by Foreign Government-2

As noted in the public report, in November 2014 the FBI received information from a long-time Confidential Human Source ("CHS") operated by Field Office-1. The FBI also received corroborating information from two separate, authorized Foreign Intelligence Surveillance Act ("FISA") surveillances that ███████████████████████████████████████████████████ Although ███████████████████████ it was widely believed that ███████████████████████████

One person ("Non-U.S. Person-1") directly tasked by the leader of Foreign Government-2 with helping to facilitate this plan resided overseas at the time, but had indicated that he/she was planning to travel to the United States in late 2014.[98] Field Office-1 sought FISA coverage of Non-U.S. Person-1, almost immediately, in order to obtain access to his/her email accounts and to conduct a search of him/her as soon as he/she arrived in the United States.[99] Although Field Office-1 attempted to obtain expedited approval for the FISA authorization,[100] the certified copy of the application was sent by OI to the FBI Headquarters for final approval where it remained "in limbo," according to Field Office-1 SAC-1, for approximately four

---

[96] (U) Classified Appendix Document-12.

[97] (U) FBI-AAA-03-0000482, Email from Field Office-1 SAC-1 to FBI Director James Comey, April 14, 2015.

[98] ███████████████ FBI-AAA-12-0023529 (Codename-1 Investigation Chronology); *see also* OSC Report of Interview of Headquarters Supervisory Special Agent-4 dated May 28, 2020 at 6.

[99] (U) FBI-AAA-03-0000482 at 0000483, Email from Field Office-1 SAC-1 to FBI Director James Comey, April 14, 2015.

[100] (U) FBI-AAA-12-0023529 (Codename-1 Investigation Chronology).

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

████████████████████████████

months.[101]  According to another agent, the application lingered because "everyone was 'super more careful'" and "scared with the big name [Clinton]" involved.[102]  "[T]hey were pretty 'tippy-toeing' around HRC because there was a chance she would be the next President."[103] Similarly, Field Office-1 SAC-1 told investigators that, when she spoke with the Counterintelligence Division Assistant Director and Deputy Assistant Director, they alluded to the fact that they did not want a presidential candidate on tape, even though Field Office-1 SAC-1 believed that was a very remote possibility.[104]  According to the records the Office reviewed, it appears that the delay also may have been partially attributable to a decision to await the confirmation of the incoming Attorney General.[105]

████████  Although Non-U.S. Person-1's travel to the United States was postponed, the Department eventually decided that it would authorize seeking FISA authority, but only after there was a commitment that Clinton and others who were being targeted by Foreign Government-2 would receive defensive briefings.[106]  As noted in the public report, these briefings were given, but it took approximately 11 months from the time of the receipt of the original allegations.

---

[101] (U) FBI-AAA-03-0000482 at 0000483, Email from Field Office-1 SAC-1 to FBI Director James Comey, April 14, 2015.

[102] (U) OSC Report of Interview of Headquarters Supervisory Special Agent-4 dated May 28, 2020 at 8.

[103] (U) OSC Report of Interview of Headquarters Supervisory Special Agent-4 dated May 28, 2020 at 9.

[104] ████████ OSC Report of Interview of Field Office-1 SAC dated Sept. 10, 2020 at 1.

[105] ████████ OSC Report of Interview of Field Office-1 SAC dated Sept. 10, 2020 at 3.

[106] ████████████ FBI-AAA-12-0023529 at 31 (Codename-1 Investigation Chronology).

- 24 -

████████████████████████████

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

███████████████████

**(U) III. Section IV.D.1.a.ii – Assessment in the FISA renewal applications regarding Carter Page's July 2016 Moscow trip and purported meetings with Igor Sechin and Igor Divyekin**

███████████████████

██████ As set out in the unclassified report, the leadership of the FBI directed that Page not be interviewed at the time that he (Page) sent a letter to Director Comey volunteering to be interviewed, and in fact no interview of Page was approved by Director Comey until March 2017.[111] Page then voluntarily had not one, but five, interviews. The relevant FBI FD-302 interview reports do not indicate that Page was ever asked about the above-referenced email sent to the campaign in July 2016, and the FBI's reasoning for not asking is unclear. Put another way, despite the fact that the email – and the FBI's assessment of its import – were included in three of the four Page FISA applications, two of which were submitted to the FISC *after* the FBI had interviewed Page on five occasions, it appears Page was never asked about the email during those interviews.[112]

---

[107] (U) *SSCI Russia Report*, pt. 5, at 549.

[108] (U) *Id.*

[109] (U) *See In re Carter W. Page*, Order No. 17-52 at 31-32 (FISC Jan. 12, 2017) (renewal application) (nonpublic version); *In re Carter W. Page*, Order No. 16-1182 at 15-18 (FISC Oct. 21, 2016) (initiation mentioning meetings with Sechin and Divyekin) (publicly released version).

[110] (U) *See In re Carter W. Page*, Order No. 17-52 at 31-32 (nonpublic version).

[111] ██████ *See* Lync Message exchanges of 10/13/2016 and 3/8/2017 among Case Agent-1, Special Agent-2, Special Agent-3, Supervisory Special Agent-1, Supervisory Special Agent-3, Chicago Agent-1, and Support Operations Specialist-1 as referenced in the unclassified report in Section IV.D.h.ii.

[112] (U) The Crossfire Hurricane investigators interviewed Page on March 9, 10, 16, 30, and 31, 2017.

███████████████████

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

(U) In November 2017, however, Page's email to campaign officials was explored by Congressman Adam Schiff during Page's testimony before the House Permanent Select Committee on Intelligence ("HPSCI"). In his testimony, Page confirmed to Schiff that he had sent the email in question, which led to Schiff inquiring:

> Mr. Schiff: "Dr. Page, Mr. Steele in the dossier makes reference to a meeting that you had with a representative of the Presidential administration. Did you meet with any representatives of the Presidential administration while you were in Moscow in July of last year?"
>
> Mr. Page: "Just that brief greeting I mentioned."
>
> Mr. Schiff: "So the only person you met - you only met with a single person from the Presidential administration and that was Dvorkovich?"
>
> Mr. Page: "Yes sir, again, being very careful of the distinction between met and meeting, yes."
>
> Mr. Schiff: " . . . on July 8, of last year, you wrote in an email to the campaign that you had incredible insights and outreach that you received from Russian legislators and senior members, plural, of the Presidential administration . . . ."
>
> Mr. Page: "There has been - again, great feedback and positive feelings were expressed in public forums and just reading the newspaper in Russian that there was hope for the future. . . "[113]

Later, Schiff inquired as follows:

> Mr. Schiff: "Dr. Page, I'm referring to Bates stamp [redacted] in which you relate that you had received insights and outreach from Russian legislators and senior members of the Presidential administration. What members of the Presidential administration did you meet?"
>
> Mr. Page: "No meetings. You know, it's insights versus outreach. The insights were primarily based on the materials or the ideas that I read in the press, similar to my listening to President Trump in the various speeches that I heard of his."[114]

Finally, Schiff ended by stating:

> Mr. Schiff: " . . . [a]nd what you have related privately to the Trump campaign, that you had met with Russian legislators and senior members of the Presidential administration."

---

[113] (U) HPSCI, *Testimony of Carter Page* at 40-41 (Nov. 2, 2017), https://intelligence.house.gov/uploadedfiles/carter_page_hpsci_hearing_transcript_nov_2_2017.pdf.

[114] (U) *Id.* at 41.

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

███████████████

Mr. Page: "I do not see the word 'meeting' in this sentence, Congressman Schiff. Again, outreach is available, and incredible insights were provided . . . ."[115]

As the transcript of the hearing reflects, Page was correct in his assertion that his email did not reference or mention any meetings with any Russian officials.

(U) The Senate Select Committee on Intelligence ("SSCI") also discussed this email and Page's July 2016 trip to Moscow in its report.[116] The report described Page's testimony regarding the email, noting that he had difficulty recalling the alleged high-level engagements he referenced in it.[117] Page also testified that the "incredible insights and outreach" mentioned in the email were "the exchange with academics over dinner on July 5; one encounter he had with a staff member who worked for a Duma (Russian parliament) member and whose name he could not recall; and, the handshake with [Deputy Prime Minister] Dvorkovich at the New Economic School commencement ceremony."[118] Page also told the Committee that "the unnamed staffer and Dvorkovich were the only two people that he directly interacted with in the Russian government during the trip."[119]

████ Page's congressional testimony was consistent with his public statements to the media; statements he made to CHS-1 in the conversations CHS-1 recorded; and statements he made to the FBI during his interviews in March 2017. Yet the FBI "assessed" in both the April 2017 and June 2017 FISA renewal applications that the email Page sent to campaign officials was evidence of Page having met Russian government officials, including legislators and members of the Presidential administration and, in particular, Sechin and Divyekin. At a minimum, the various statements of Page, including perhaps most particularly the recorded statement with CHS-1, should have been brought to the attention of OI and the FISC in a more fulsome way.[120]

████ Relatedly, as noted in the unclassified portion of this report, neither OI nor the FISC was informed that, in December 2016, CHS-1 stated that Page had told CHS-1 that Page had met with Sechin during a post-election trip to Russia. This assertion was untrue as our investigators established by reviews of the recording CHS-1 had made of the meeting and the

---

[115] (U) *Id.* at 42.

[116] (U) *See SSCI Russia Report*, pt. 5, at 548-550.

[117] (U) *Id.* at 549-550.

[118] (U) *Id.* at 550.

[119] (U) *Id.*

[120] (U) *See In re Carter W. Page*, Order No. 17-375, at 32 (FISC April 7, 2017) (publicly released version) (informing the FISC that "Page publicly, and in interviews with the FBI, has denied meeting with Sechin and Divyekin during his July 2016 trip to Moscow"); *In re Carter W. Page*, Order No. 17-679, at 35-36 (FISC June 29, 2017) (publicly released version) (same).

███████████████

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY

transcript of the meeting that was prepared months later by the FBI.[121]  Thus, the Crossfire Hurricane investigators either reviewed the recording and failed to report the erroneous reporting to OI and the FISC, or they never took the time to review the materials.[122]  In either case, the FISC was not apprised of information that could have cast doubt on the reliability of CHS-1's information.[123]  In addition, OI was not apprised of the doubts some of the Crossfire Hurricane investigators had about the CHS's claim or of the possibility that Sechin would have had no interest in meeting with Page at that time.[124]

[121]  ████  According to FBI records, the transcript was completed on April 25, 2017 and a corrected copy done on or about May 2, 2017.  FBI-AAA-KC-0024034-1; FBI-AAA-KC-0024035-1.

[122]  (U) As noted in Section IV.D.1.h.vi of the unclassified report, no records were provided to the Office that showed that the recording had been reviewed by Crossfire Hurricane investigators or its contents shared with the Department lawyers working on the Page FISA applications.  In addition, the FBI's Inspection Division found that the recording was not reviewed and the investigating agents simply relied on the CHS's erroneous report of the conversation.  *See FBI Inspection Division Report* at 217.

[123]  (U) *See* Section IV.D.1.h.vii of the unclassified report.

[124]  (U) Lync Message exchange between Supervisory Special Agent-1 and Case Agent-1 on 12/21/2016 and 12/22/2016:

> Case Agent-1: "CHS reached out to me today, remembered that [Page] told [CHS-1] that he met with Sechin this past trip." Supervisory Special Agent-1: "Come on." Case Agent-1: "yup, said [CHS-1] just remembered it yesterday after reading Sechin's name in the paper." Supervisory Special Agent-1: "We need that audio then."

Lync Exchange between Case Agent-1 and Analyst-1 on 12/23/2016:

> Analyst-1: "man, yeah, I just don't get him [referring to Page] or Cohen at all man . . . it's like they are living in a dream world . . . that would be pretty interesting if he really did meet with him." Analyst-1: "what possible reason would Sechin have to meet with him now, serves no benefit to him." Case Agent-1: "I really believe he exaggerates his meetings.  He may have been in a meeting where he was 1 of 200 people."

AUTHORIZED FOR PUBLIC RELEASE BY CHAIRMAN GRASSLEY



The application also summarized a June 2017 interview of Klimentov conducted by Special Counsel Mueller's investigators. In that interview, Klimentov stated that he was familiar with Page's visit to Moscow in July 2016 when Page spoke at the New Economic School, but noted that it was unlikely that Page met with Sechin during this visit.[127] The final renewal application, however, discounted Klimentov's supposition that Page did not meet with Sechin. In particular, the application explained that Klimentov may not have known about all of Page's meetings.

---

[125] (U) *In re Carter W. Page*, Order No. 17-375, at 33-34 (nonpublic version).

[126] (U) *Id.* at 34 (nonpublic version).

[127] (U) *In re Carter W. Page*, Order No. 17-679, at 39 (publicly released version).

[128] (U) *Id.* at 21 (bolding in original omitted) (publicly released version).

[129] (U) Interview of U.S. Person-5 dated June 1, 2017 by FBI agents assigned to the Mueller investigation; *see also Redacted OIG Review* at 221 n.371 (discussing the OIG's interviews and when or whether the statement about the chauffeured car may have been made).

[130] (U) Interview of U.S. Person-5 dated June 1, 2017 by FBI agents assigned to the Mueller investigation at 5.